## 74200. McSWEENEY v. THE STATE.
### (358 SE2d 465)

BIRDSONG, Chief Judge.

Paul K. McSweeney appeals his conviction for trafficking in cocaine and unlawful possession of more than one ounce of marijuana. McSweeney was attempting to board a flight out of the Atlanta Hartsfield International Airport, and presented himself to the security checkpoint. The security checkpoint is located between the main concourse and the boarding gates of the airlines. Each gate uses two types of machines, an X-ray to screen hand-carried luggage for weapons, explosives and flammable liquids; and a walk-through magnetometer which is used to detect metal objects on the person of a passenger.

Clarence Allen, an employee of A.R.C. Security, a private security agency, employed by the airport for security purposes, saw McSweeney pass through a checkpoint without any luggage, but then McSweeney turned around, left the secure area and reentered the concourse. A few minutes thereafter, he saw McSweeney return to his checkpoint with hand luggage which he placed on the X-ray conveyor belt. McSweeney passed through the magnetometer without incident, but the operator of the X-ray machine told Allen to "check" McSweeney's luggage. Allen asked McSweeney if he could check his luggage and McSweeney said "no." Allen advised McSweeney if he did not check it the police officer standing behind him would check it, then "he [McSweeney] just went running . . . down the concourse." Police Officer N. T. Stone was on duty behind the security check-

point when she heard McSweeney give a loud and emphatic "no." She started toward him and he left the checkpoint running. She ran after him but could not catch him. She put out an all-points bulletin for his arrest and returned to the checkpoint. A search of McSweeney's luggage revealed two bottles of liquor, some marijuana, and a white powder which was subsequently identified as cocaine. When McSweeney was apprehended, a search of his person revealed additional marijuana. Defendant's motion to suppress was denied and he brings this appeal. *Held*:

1. Defendant enumerates but one error, the legality of the search of his luggage, which he contends violates the Fourth Amendment to the United States Constitution. "The United States Constitution does not forbid searches and seizures. It forbids only unreasonable searches and seizures." *Elkins v. United States*, 364 U. S. 206 (80 SC 1437, 4 LE2d 1669). Further, the basic purpose of the Fourth Amendment is only "to safeguard the privacy and security of individuals against arbitrary invasions by *governmental officials*." (Emphasis supplied.) *Michigan v. Tyler*, 436 U. S. 499, 504 (98 SC 1942, 56 LE2d 486). Conversely, "a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment." *United States v. Place*, 462 U. S. 696, 707 (103 SC 2637, 77 LE2d 110). Hence, at issue is the standing in priority of the Fourth Amendment right of privacy of the individual, as contrasted with an equally compelling right to safety and security of airline passengers.

Air piracy, the unlawful seizure and diversion of commercial aircraft to unscheduled locations, with the concomitant kidnapping and possible detention of passengers and crew as hostages, is a contemporary phenomenon with potentially catastrophic consequences. The jeopardy posed to the lives of the passengers and the crew, with the attendant disregard of the passengers' constitutional rights, clearly and unequivocally demonstrates a critical need for stringent security measures. *United States v. Cyzewski*, 484 F2d 509, 511 (5th Cir. 1973), U. S. cert. dismissed, 415 U. S. 902. The aerial hijacker's arsenal is not confined to a gun or a knife. Modern weapons technology has miniaturized weapons to the size of a fountain pen and placed plastic explosives in a tube of toothpaste. *United States v. Skipwirth*, 482 F2d 1272 (5th Cir. 1973). Airport security must be alert to detect all types of weaponry, and because of the wide range and variety of devices and substances available to the hijacker which can be used to intimidate and coerce an air crew, the security checkpoint guard is not limited to searches for conventional weapons, explosives, or flammable liquids. *Skipwirth*, supra at 1277.

Because of the danger posed by air piracy, airports are sui generis, and like international borders, are "critical zones" in which special Fourth Amendment considerations apply. *United States v.*

*Herzbrun*, 723 F2d 773, 775 (11th Cir. 1984); *Cyzewski*, supra; *Skipwirth*, supra; *United States v. Legato*, 480 F2d 408, 411 (5th Cir. 1973), U. S. cert. den., 414 U. S. 979; *United States v. Moreno*, 475 F2d 44 (5th Cir. 1973), U. S. cert. den., 414 U. S. 840. Courts balance the security interest of the public against intrusion into the rights of the individual, and consider three main factors: (1) public necessity, (2) efficacy of the search, and (3) degree of intrusion. *Skipwirth*, supra at 1275. Courts have judicially recognized the public necessity that potential harm posed by air piracy should be foiled. Id. And, airport security inspections are the most efficacious method of thwarting air piracy. Id. Airport searches are designed so that the degree of intrusion into the right of privacy of the individual is minimal, and there is a complete absence of stigma to a search since all passengers are subjected to the same search. Id. "The courts have consistently held airport security measures constitutionally justified as a limited and relatively insignificant intrusion of privacy [of the passenger] balanced against the need to protect aircraft and its passengers." *Cyzewski*, supra at 512.

Federal courts are almost unanimous in finding that when an aircraft passenger presents himself to an airport security checkpoint he has consented to the screening of his luggage by the X-ray machine, and his person by the magnetometer. *United States v. DeAngelo*, 584 F2d 46, 48 (4th Cir. 1978), U. S. cert. den., 440 U. S. 935; *Cyzewski*, supra at 512. Thereafter, if the X-ray reveals an unidentifiable object or an identifiable object which could pose a danger to security of the aircraft and passengers, or if the magnetometer detects metal on the person of the passenger, these indicia provide the "mere suspicion of possible illegal activity" which justifies further investigation by security personnel. *Herzbrun*, supra at 776. "Mere suspicion" (i.e., articulable suspicion) is the criterion recognized as sufficient basis for a physical search of the luggage and the person at our national borders. *Skipwirth*, supra at 1275; *Herzbrun*, supra at 776. This reasonable fear of the security personnel for the safety of airline passengers justifies a limited physical search of the clothing of a passenger and his luggage for weapons, explosives, and flammable liquids, which could be used to effect air piracy. *United States v. Epperson*, 454 F2d 769, 772 (4th Cir. 1972), U. S. cert. den., 406 U. S. 947; *United States v. Smith*, 643 F2d 942, 944 (2nd Cir. 1981), U. S. cert. den., 454 U. S. 875. The constitutional validity of the search of the person and the passenger's luggage is "entirely justifiable and reasonable" under the articulable suspicion rule of *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889). *Epperson*, supra at 772; *DeAngelo*, supra at 47; see also *Place*, supra, 462 U. S. at 706.

Although it is arguable that McSweeney withdrew his consent to search after the X-ray machine alerted security authorities to possible

danger, we agree with the rationale and reasoning of *DeAngelo*, supra at 48, that once consent is given to search it cannot be withdrawn after detection devices indicate danger to the security of the flight. A traveler cannot "attempt to enter the secure area and then beat a retreat if the search proves not to his liking." *Herzbrun*, supra at 776. These generally known search procedures are "more valuable for what they discourage than what they discover" and we have found no viable constitutional basis to reward a "heads-I-win, tails-you-lose guarantee to criminals" attempting to board an aircraft with weapons. Id. The criminal cannot rely upon the argument that he will consent to a search until security personnel discover secreted material, and then withdraw his prior consent, and repeat the procedure until he is successful in avoiding detection. This is not a game of "hide-and-seek" between security personnel and a passenger attempting a criminal venture. It is a legitimate endeavor by security personnel to protect airline passengers from potential harm. Thus, a search need not be curtailed, even if the passenger decides not to take the flight, and we reject any "right-to-leave" argument. *Herzbrun*, supra at 777; *DeAngelo*, supra at 48.

2. We need not address any issue as to whether the Fourth Amendment applies to the use of private security forces at the Atlanta Airport, as opposed to governmental officials. See *State v. Rosof*, 180 Ga. App. 637 (1) (350 SE2d 36). We will note only that security searches are governed by FAA regulations and have their genesis as well as their future in governmental control. See 71 Columbia L.R. 1039, Airport Security Searches & the Fourth Amendment.

*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED MAY 19, 1987.

*Charles M. Gisler*, for appellant.

*Robert E. Keller, District Attorney, Clifford A. Sticher, Assistant District Attorney*, for appellee.